Lester D. MILHOUSE et al., Appellant,

v.

Edward H. LEVI, United States
Attorney General, et al.

No. 75–1844.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 19, 1976.

Decided Dec. 13, 1976.

Richard B. Wolf, Washington, D. C., with whom Victor H. Kramer, Charles E. Hill and Diane B. Cohn, Washington, D. C., were on the brief for appellants.

S. Cass Weiland, Atty., Dept. of Justice, Washington, D. C., with whom Robert L. Keuch, Atty., Dept. of Justice, Washington, D. C., was on the brief for Federal appellees.

C. Francis Murphy, Corp. Counsel for the District of Columbia, Louis P. Robbins, Principal Asst. Corp. Counsel, Richard W. Barton and Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., were on the brief for the District of Columbia appellees.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by District Judge MERHIGE.

MERHIGE, District Judge:

Appellants, inmates of the Lorton Reformatory, a part of the District of Columbia Corrections System, and others,[1] filed this action in the District Court challenging an order issued by the Attorney General of the United States on October 1, 1974 which curtailed furlough privileges previously available to certain inmates. The District Court found the Attorney General to be statutorily authorized to promulgate the contested order, but concluded that he had done so in violation of the rule-making procedures of the Administrative Procedure Act, 5 U.S.C. § 553(b).[2] Having so concluded, the District Court dismissed the action as to all but the Attorney General and the United States Department of Justice. This appeal followed.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. Several non-inmates and one organization joined as plaintiffs in this action.

2. Rather than invalidate the October 1, 1974 order, the District Court directed the Attorney General to publish it in the Federal Register pursuant to the emergency provisions of 5 U.S.C. § 553(b)(3)(B) and (d); post it at conspicuous places at the Lorton Reformatory; and invite public comment for a thirty day period. The defendants did not appeal from either the finding of rule-making deficiencies or the remedial order. The Attorney General has since certified his compliance with the District Court's order. See 40 Fed.Reg. 30977 (July 24, 1975).

Prior to October 1, 1974, the District of Columbia Department of Corrections, acting under authority delegated to it by the Attorney General,[3] promulgated guidelines to govern the furlough programs in operation at the Lorton Reformatory. Pursuant to the pre-October 1, 1974 guidelines, furloughs were made available to any inmate at Lorton who the Department believed would honor the trust placed in him, regardless of the crime for which he had been convicted and incarcerated. See District of Columbia Department of Corrections Order 4920.1A (Aug. 28, 1974). On October 1, 1974, the Attorney General issued an order restricting the furlough eligibility of persons who had been convicted of certain crimes and who were not within six months of a firm date of release from confinement.[4] The District of Columbia shortly thereafter implemented the Attorney General's order. See District of Columbia Department of Corrections Order 4920.3 (Nov. 11, 1974). It is beyond dispute that the guidelines premised on the Attorney General's order are substantially more restrictive than those in effect prior thereto, and have resulted in the termination of the furlough program of a number of the appellants.

The pivotal issue before this Court is whether the Attorney General has the authority to regulate the furlough program at the Lorton Reformatory. The matter is somewhat complicated by Lorton's status as "an integral part of the District of Columbia correctional system"[5] and the unique

3. *See, e. g.,* 28 C.F.R. § 0.99, Appendix to Subpart Q (1974) which provides:

By virtue of the authority vested in me by the Act of September 1, 1916, 39 Stat. 711 (D.C.Code Section 24–402), by Section 11 of the Act of July 15, 1932 as added by the Act of June 6, 1940, 54 Stat. 244 (D.C.Code Section 24–425), and by the Act of September 10, 1965, Public Law 89–176 (18 U.S.C. Section 4082), the Board of Commissioners of the District of Columbia or their authorized representatives are hereby authorized to transfer such prisoners as may be in their custody and supervision by virtue of having been placed in a correctional institution of the District of Columbia by the Attorney General, from such institution to any available, suitable, or appropriate institution or facility (including a residential community treatment center) within the District of Columbia, and the Board of Commissioners of the District of Columbia or their authorized representatives are further authorized to extend the limits of the place of confinement of such business for the purposes specified, and within the limits established, by the Act of September 10, 1965, Public Law 89–176 (18 U.S.C. Section 4082).

4. The order, as it appeared in 39 Fed.Reg. 36009–36010 (October 7, 1974) provided as follows:

By virtue of the authority vested in me by the Act of September 1, 1916, 39 Stat. 711 (D.C.Code Section 24–402), by Section 11 of the Act of July 15, 1932, as added by the Act of June 6, 1940, 54 Stat. 244 (D.C.Code Section 24–425) and by the Act of September 10, 1965 (18 U.S.C. 4082), (a) the Mayor of the District of Columbia or his authorized representative is hereby authorized to transfer such prisoners as may be in his custody and supervision, by virtue of having been placed in a correctional institution of the District of Columbia pursuant to the authority of the Attorney General from such institutions to any available, suitable, or appropriate institution or facility (including a residential community treatment center) within the District of Columbia, and the Mayor or his authorized representative is further authorized to extend the limits of the place of confinement of such prisoners for the purposes specified, and within the limits established, by the Act of September 10, 1965 (18 U.S.C. 4082).

(b) With respect to a prisoner convicted of a crime of violence who is not within six months of a firm date of release from confinement, the authority conferred by subsection (a) shall be exercised only in exceptional circumstances and only upon written justification and approval of the Director of the District of Columbia Department of Corrections personally. Prior to the exercise of authority under this subsection, notice and justification of transfers or extensions of the limits of confinement shall be provided to the Mayor.

(c) With respect to all other prisoners, the authority conferred by subsection (a) may be exercised by an authorized representative designated by the Mayor.

(d) As used in this Order "crime of violence" means murder, manslaughter, rape, kidnaping, robbery, burglary, assault with intent to kill, assault with intent to rape, or assault with intent to rob.

5. *McCall v. Swain,* 166 U.S.App.D.C. 214, 510 F.2d 167, 170 (1975). The Lorton complex was created by a special act of Congress. Act of March 3, 1909, 35 Stat. 717. The United States retains legal title to the land upon which the prison is located having acquired the land in several parcels beginning in 1910. The facility

relationship between the District of Columbia and the federal government.[6] For the reasons which follow, this Court has concluded that the Attorney General was empowered to issue the contested regulations.

■ There is no question but that the Attorney General has the statutory authori-

ty to designate the place of confinement of all persons convicted of a crime in a court of the District of Columbia. D.C.Code § 24–402 (1973 ed.).[7] The Attorney General is additionally vested with custody over such persons throughout their entire period of incarceration. D.C.Code § 24–425 (1973

---

is intended to act as a place of confinement for persons convicted of crimes in the District of Columbia. The powers of government over the area are exercised by the District of Columbia. See D.C.Code § 24–442 (1973 ed.) See generally, Board of Supervisors of Fairfax County v. United States, 408 F.Supp. 556 (E.D.Va.1975). Decisional law recognizes the local nature of the Lorton facility. See, e. g., Wright v. Jackson, 505 F.2d 1229 (4th Cir. 1974); Young v. Director, United States Bureau of Prisons, 125 U.S.App.D.C. 105, 367 F.2d 331, 338 n. 8 (1966). Indeed, Judge Wright of this Court has suggested that when the Attorney General takes custody of persons and designates their place of confinement pursuant to an order of the local Superior Court of the District of Columbia he acts in a non-federal capacity. McCall v. Swain, supra, 510 F.2d at 180 n. 34.

**6.** Its relationship has been characterized as analogous to that of state to national government for certain purposes. The state-federal analogy has been embraced by the Supreme Court for the purposes of the division of judicial responsibility between local and federal courts. Accordingly, this Court has treated local courts as "state" courts for the purposes of exhaustion and federal habeas corpus jurisdiction. Palmore v. Superior Court of the District of Columbia, 169 U.S.App.D.C. 323, 515 F.2d 1294, 1308–1312 (1975) (en banc) vacated and remanded in light of Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Johnson v. Robinson, 166 U.S.App.D.C. 62, 509 F.2d 395, 398–399 (1974). Moreover, the Rules of Evidence enacted by Congress to govern actions brought in the local District of Columbia courts have been deemed inapplicable to the federal courts sitting therein due to the distinct and independent nature of the two court system. United States v. Hairston, 161 U.S.App.D.C. 466, 495 F.2d 1046, 1054 (1974). See also United States v. Jones, 174 U.S.App. D.C. 34, 527 F.2d 817 (1975); United States v. Greene, 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973).

The analogy, however, is far from complete. "The District of Columbia is constitutionally distinct from the States." Palmore v. United States, 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973) citing Hepburn v. Ellzey, 2 Cranch, 445, 2 L.Ed. 332 (1805). Thus, provisions of the District of Columbia Code are not state statutes for purposes of appealing to the Supreme Court pursuant to 28 U.S.C. § 1257(2). Palmore v. United States, supra.

Moreover, violation of criminal provisions of the District of Columbia Code are considered offenses against the laws of the United States notwithstanding the local nature of the court system. United States v. Cunningham, 530 F.2d 970 (4th Cir. 1975); United States v. Perez, 488 F.2d 1057 (4th Cir. 1974).

**7.** D.C.Code § 24–402 (1973 ed.) provides:

Whenever any person has been convicted of crime in any court in the District of Columbia and sentenced to imprisonment for more than one year by the court, the imprisonment during the term for which he may have been sentenced or during the residue of said term may be in some suitable jail or penitentiary or in the reformatory of the District of Columbia; and it shall be sufficient for the court to sentence the defendant to imprisonment in the penitentiary without specifying the particular prison or the reformatory of the District of Columbia and the imprisonment shall be in such penitentiary, jail, or the reformatory of the District of Columbia as the Attorney-General shall from time to time designate: Provided, That the Commissioner of the District of Columbia is vested with jurisdiction over such male and female prisoners as may be designated by the Attorney-General for confinement in the reformatory of the District of Columbia from the time they are delivered into his custody or into the custody of his authorized superintendent, deputy, or deputies, and until such prisoners are released or discharged under due process of law: And provided further, That the residue of the term of imprisonment of any person who has prior to July 1, 1916, been convicted of crime in any court in the District of Columbia and sentenced to imprisonment for more than one year by the court may be in the reformatory of the District of Columbia instead of the penitentiary where such persons may be confined on July 1, 1916, and the Attorney-General, when so requested by the Commissioner of the District of Columbia, is authorized to, and he shall, deliver into the custody of the superintendent of said reformatory or his deputy or deputies any such person confined in any penitentiary in pursuance of any judgment of conviction in and sentence by any court in the District of Columbia, and the Commissioner of the District of Columbia is vested with jurisdiction over such persons from the time they are delivered into the custody of said superintendent or his duly authorized deputy or deputies, including the time when they are in

ed.).[8] Thus, in *Frazier v. United States,* 119 U.S.App.D.C. 246, 339 F.2d 745, 746 (1964), we noted that "it is clear that the 'custody' intended is not limited to actual physical custody, but denotes a type of legal custody which remains in the Attorney General even though the prisoner is assigned to an institution over which the Department of Justice has no control." (footnotes omitted). Thus, a person who escapes from a facility operated by the District of Columbia, such as the Lorton Reformatory, escapes from the custody of the Attorney General within the meaning of 18 U.S.C. § 751. *United States v. Taylor,* 158 U.S. App.D.C. 298, 485 F.2d 1077 (1973); *Frazier v. United States, supra.*

Congress, additionally, has empowered the Attorney General to initiate furlough programs. 18 U.S.C. § 4082(c)(1).[9] In enacting this legislation, the Congress chose to define the program in terms of extending "the limits of confinement . . ." of affected inmates. By defining furloughs in such terms, Congress authorized the Attorney General to establish such programs at Lorton for, as heretofore noted, he has custody of its inmates and the power to designate their place of confinement. Furthermore, the furlough programs at Lorton have operated under the direction of the Attorney General since their inception following the enactment of 18 U.S.C. § 4082(c)(1), Pub.L. 89–176, 79 Stat. 674 (1965). *See* 31 Fed.Reg. 704–705 (Jan. 19, 1966).[10] Thus, in order for the appellants to prevail, this Court would have to conclude that the Attorney General and the District of Columbia have misinterpreted the law for the past decade.

The Attorney General's authority to regulate the furlough programs of the District of Columbia correctional facilities has here-

transit between such penitentiary and the reformatory of the District of Columbia, and during the period they are in such reformatory or until they are released or discharged under due process of law. The Attorney-General shall pay the cost of the maintenance of said prisoners so transferred, said payment to be from appropriations for support of convicts, District of Columbia, in like manner as payments are made for the support of District convicts in federal penitentiaries. Nothing herein contained shall be construed as applying to the National Training School for Boys or the National Training School for Girls. (Sept. 1, 1916, 39 Stat. 711, Ch. 433)

8. D.C.Code § 24–425 (1973 ed.) provides:

All prisoners convicted in the District of Columbia for any offense, including violations of municipal regulations and ordinances and Acts of Congress in the nature of municipal regulations and ordinances shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such

person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons. (July 15, 1932, Ch. 492, § 11, as added June 6, 1940, 54 Stat. 244, Ch. 254, § 8).

9. 18 U.S.C. § 4082(c)(1) provides:

(c) The Attorney General may extend the limits of the place of confinement of a prisoner as to whom there is reasonable cause to believe that he will honor his trust, by authorizing him, under prescribed conditions, to—

(1) visit a specifically designated place or places for a period not to exceed thirty days and return to the same or another institution or facility. An extension of limits may be granted to permit a visit to a dying relative, attendance at the funeral of a relative, the obtaining of medical services not otherwise available, the contacting of prospective employers, the establishment or reestablishment of family and community ties or for any other significant reason consistent with the public interest:

.    .    .    .    .

10. The Order of the Attorney General of January 13, 1966 which appeared in 31 Fed.Reg. 704–705 is identical to the codified provision found in 28 C.F.R. § 0.99, Appendix to Subpart Q (1974). *See* footnote 3 *supra.* The provision remained unchanged until the Order of October 1, 1974 was issued. *See* footnote 4, *supra.*

tofore been implicitly acknowledged by this Circuit. In *Green v. United States,* 157 U.S.App.D.C. 40, 481 F.2d 1140 (1973), two prisoners who had been sentenced in the District of Columbia sought leave to appeal *in forma pauperis* the denial by the District Court of motions designed to enable them to participate in work release programs. In denying their motion, the Court noted:

> The work release legislation permits the Attorney General to authorize a prisoner "as to whom there is reasonable cause to believe he will honor his trust . . . to . . . work at paid employment or participate in a training program in the community on a voluntary basis while continuing as a prisoner of the institution or facility to which he is committed . . . ." Both the literal terms and legislative history of Section 4082(c) make it clear that the decision as to whether or not to authorize work release is one dependent on an exercise of discretion by the Attorney General. Although Congress recognized in amending Section 4082 in 1965 that work release may, in some instances, be a valuable rehabilitative tool, it did not establish an absolute legal right to immediate work release such as is urged by petitioners.

*Green v. United States, supra,* 481 F.2d at 1141–42. (footnotes omitted.) In light of the *Green*-appellants' status as inmates of a District of Columbia correctional institution and the similarity between work release and furlough programs,[11] the heretofore quoted language recognizes the Attorney General's authority to promulgate regulations such as the one presently in issue.

■ The thrust of appellants' contention is that the District of Columbia Court Reform and Criminal Procedure Act (Court Reform Act), Pub.L. No. 91–358, 84 Stat. 473 (1970) and the District of Columbia Self-Government and Reorganization Act (Home Rule Act), Pub.L. No. 93–198, 87 Stat. 774 (1973) reflect a congressional intent to vest the District of Columbia with a greater degree of autonomy and reduce the role of the federal government in making decisions of purely local concern. This policy, appellants submit, is perverted by federal regulation of the internal affairs of the Lorton Reformatory. The appellants thus analogize the Attorney General's actions herein, to an attempted regulation of state furlough programs in facilities which house federal prisoners.[12] Concededly, there is support for this position.[13] The Court is of

---

**11.** The work release and furlough programs are authorized by the same statute and regulations. *See* 18 U.S.C. § 4082(c) and 28 C.F.R. § 0.99, Appendix to Subpart Q.

**12.** *See* 18 U.S.C. § 4082(b) and *McCall v. Swain, supra,* 510 F.2d at 181–182.

**13.** In that the Lorton facility is operated by the District of Columbia as a place of confinement for persons convicted in local courts of local offenses, it is logical for the District of Columbia to regulate the facility's rehabilitational programs. This logic is buttressed by the state-federal analogy drawn in judicial matters affecting the rights of persons convicted under the two systems. See footnotes 5 and 6, *supra.*

The status of the Lorton Reformatory, moreover, has been the subject of congressional debate. Senator Scott of Virginia, then a member of the House of Representatives, sponsored a provision in the Court Reform Act which would have conferred jurisdiction over the Lorton Reformatory with the Department of Justice. This provision was made part of the House Bill but was not contained in the Senate version. See H.R.Rep.No.907, 91st Cong., 2d Sess. (1970). The Conference Committee dropped the Lorton transfer provision. See H.R.Rep.No.1303, 91st Cong., 2d Sess. (1970). Three years later during the debate over the Home Rule Act, Senator Scott once again proposed to oust local control over Lorton and replace it with that of the federal government. The Scott amendment was vigorously opposed by Senator Eagleton who argued that the District of Columbia needed to operate and maintain its own penal institution as an incident of self-government of purely local affairs. See 119 Cong.Rec. 22949–22959 (July 10, 1973). The Scott amendment was defeated by the Senate. 119 Cong.Rec. 22964 (July 10, 1973). These two actions can reasonably be interpreted to reflect a congressional policy against federal, as exemplified by the Attorney General, regulation of internal rehabilitational programs.

Furthermore, Section 4082(c) of Title 18 upon which authority the Attorney General relies, may be seen to apply to federal prisoners, as opposed to persons convicted of local offenses in local District of Columbia courts. The legislative history of the original provision and its amendment indicates an intent to empower the Attorney General to organize furlough programs for "federal prisoners" and

the view that to invalidate the Attorney General's order on this ground would be to ignore the statutes heretofore alluded to, or assume that the failure to amend their provisions was mere legislative oversight.

Congress, in enacting both the Court Reform Act and the Home Rule Act, did not amend any of the provisions under which the Attorney General has regulated the furlough program at the Lorton Reformatory. In light of the longstanding practice in this regard, any assumption that failure to amend was due to inadvertence as distinguished from design would be to ignore the meticulous care Congress exhibited in conforming other statutory provisions to its legislative scheme for the District of Columbia.[14] In short, if Congress had intended to alter the nature of the Attorney General's control over the Lorton furlough program, same could have been done by express provision. *Cf. Palmore v. United States*, 411 U.S. 389, 395, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Farnsworth v. Montana*, 129 U.S. 104, 113, 9 S.Ct. 253, 32 L.Ed. 616 (1889). It follows, therefore, that we affirm the District Court's conclusion that the Attorney General enjoys the statutory authority to promulgate the contested order.

■ The appellants next contend that the Attorney General's order which acts to deny furlough eligibility to persons convicted prior to said order is prohibited by the *ex post facto* clause of the Constitution.[15] This claim was not presented to the District Court. The issue is one of law, however, which does not require further factual development. Hence, despite the failure of appellants to raise the issue before the District Court we will address it on its merits. *United States v. Jones*, 174 U.S.App.D.C. 34, 527 F.2d 817, 819 (1975). *Cf. Hormel v. Helvering* 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

■ The appellants cite the well-established principle that "[E]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" is constitutionally impermissible. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). *See Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Rooney v. North Dakota*, 196 U.S. 319, 325, 25 S.Ct. 264, 49 L.Ed. 494 (1905). *Cf. United States v. Henson*, 159 U.S.App.D.C. 32, 486 F.2d 1292, 1305–1306 (1973) (en banc). The gist of appellants' argument is that the curtailment of furlough privileges for those convicted prior to the issuance of the Attorney General's order constitutes an infliction of greater punishment than was possible at the time of the commission of the offense. The appellants rely primarily on a decision of the Ninth Circuit Court of Appeals which ruled that administrative alteration of parole eligibility guidelines resulting in increasing the amount of time an inmate must serve before attaining eligibility for parole, violated the constitutional provisions against *ex post facto* laws. *Love v. Fit-*

"persons convicted of offenses against the United States." See S.Rep. 93–418, 93d Cong., 1st Sess. (1973) reprinted in 1973 U.S.Code Cong. & Ad.News, p. 3017 (1973); H.R.Rep.No. 93–425, 93d Cong., 1st Sess. pp. 1–2 (1970); S.Rep.No.613, 89th Cong., 1st Sess. (1965) reprinted in 1965 U.S.Code Cong. & Ad.News, p. 3076 (1965).

Lastly, it should be noted that Congress authorized the District of Columbia Department of Corrections "to provide for their [inmates at the Lorton facility] proper treatment, care, rehabilitation, and reformation." D.C.Code § 24–442 (1973 ed.). This provision could serve as sufficient justification for local regulation of the furlough program.

14. *See, e. g.,* 28 U.S.C. § 1332(d) (the District of Columbia treated as a state for purpose of diversity jurisdiction); 28 U.S.C. § 1451 (for purposes of the removal provisions, the Superior Court of the District of Columbia is to be considered a "state court"); 28 U.S.C. § 1257 (making the District of Columbia Court of Appeals the "highest court of a State" for purposes of appealing to the Supreme Court); 28 U.S.C. § 1363 (excluding congressional enactments applicable exclusively to the District of Columbia from "laws of the United States" for purposes of federal district court jurisdiction).

15. Art. I, § 9, cl. 3 of the Constitution states "No Bill of Attainder or ex post facto Law shall be passed."

**364**

*zharris*, 460 F.2d 382 (9th Cir. 1972) *vac. as moot*, 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973). The Supreme Court, while not directly embracing the rationale as expressed by the Court of Appeals for the Ninth Circuit in *Love, supra*, has recognized that "a repealer of parole eligibility previously available to imprisoned offenders would clearly present [a] serious question under the *ex post facto* clause of Art. I, § 9, cl. 3 of the Constitution. . . ." *Warden v. Marrero*, 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974). *See also Greenfield v. Scafati*, 277 F.Supp. 644 (D.Mass.1967) (three-Judge Court), *aff'd*, 390 U.S. 713, 88 S.Ct. 1409, 20 L.Ed.2d 250 (1968).

Retroactive restrictions on parole eligibility, however, are conceptually distinguishable from the issues presented herein. The Ninth Circuit's decision in *Love, supra*, was premised upon the conclusion that parole eligibility, under local law, was part of the "law annexed to the crime when committed" within the meaning of *Calder v. Bull, supra*. Specifically, parole eligibility was considered part of the sentence. *Love v. Fitzharris, supra*, 460 F.2d at 384–385. The effect of the administrative action in that case was to lengthen the time of incarceration, and hence, constituted a greater punishment. Appellants do not suggest that the regulations herein under attack have any impact on an inmate's date of release. A furlough program, unlike parole, is not an integral part of the sentencing procedure. It is an internal rehabilitational program the denial of which cannot be said to be an element of the punishment attached to an inmate's initial conviction. Administrative regulations which adversely affect an inmate's eligibility for furloughs are not, therefore, subject to the constitutional prohibitions against *ex post facto* laws. To hold otherwise would severely limit the flexibility needed to implement innovative rehabitational programs.[16]

The last major issue[17] concerns the propriety of the District Court's dismissal of the District of Columbia defendants without reaching the question of whether they had complied with proper rule-making procedures. As the dismissal of those defendants was made pursuant to Fed.R.Civ.P., Rule 12(b)(6), we must accept as factual, the appellants' allegations. *Jenkins v. McKeithen*, 375 U.S. 411, 421–422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Those allegations as disclosed by the pleadings, in brief, are that the District of Columbia defendants promulgated furlough regulations in violation of the notice and publication provisions of the District of Columbia Administrative Procedure Act. (D.C.A.P.A.), D.C. Code § 1–1501 *et seq.* (1973 ed.). The District Court dismissed the action as to the District of Columbia defendants solely because the Attorney General was found to possess the requisite authority to issue the order which is the subject of this controversy. In light of our affirmance of the latter conclusion, the issue before us is whether the Lorton inmates stated a claim against the District of Columbia defendants notwithstanding the Attorney General's authority over the program.

The scope of the October 1, 1974 order of the Attorney General was narrow.

---

**16.** If correctional officials were unable to modify existing programs as to presently participating inmates, they might well be reluctant to initiate new programs. Moreover, should the Attorney General desire to be more stringent in granting furlough privileges yet be constrained by the *ex post facto* clause, stratified programs depending on the date one committed an offense could result.

**17.** The appellants have contended that public hearings, presumably to be held at the reformatory, are constitutionally mandated. We do not agree. Rule-making proceedings under 5 U.S.C. § 553 do not require that provisions be made for receiving oral comments. *United States v. Florida East Coast Railroad Company*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742, 756–58, 92 S.Ct. 1941, 32 L.Ed.2d 453. The defendants' action herein is the product of legislative rather than adjudicative process. The Court is unaware of any constitutional requirement to provide an opportunity for comment apart from that established by legislation regulating the rule-making process. *See Pickus v. United States Board of Parole*, 177 U.S.App.D.C. 93, 543 F.2d 240 (1976).

It merely places eligibility restrictions on persons convicted of a crime of violence. The eligibility criteria for all other prisoners as well as all other pertinent guidelines are to be established by local officials.[18] Hence, the District of Columbia defendants retain significant rulemaking responsibilities which may have a substantial impact upon appellants. In light of this Court's recent decisions in *Ramer v. Saxbe*, 173 U.S.App.D.C. 83, 522 F.2d 695 (1975) and *Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974) it is highly unlikely, as the appellees concede, that any such regulations may be issued without, as alleged, complying with the rule-making procedures of the D.C.A. P.A. Consequently, the appellants have

stated a claim against the District of Columbia defendants notwithstanding the Attorney General's authority in this area. The District Court should retain jurisdiction[19] over the District of Columbia defendants in order to determine whether compliance with the D.C.A.P.A. is required; and if so, whether there was such compliance and, if necessary, to fashion the appropriate remedy.[20]

*Affirmed in part, reversed in part and remanded.*

18. See the Attorney General's Order of October 1, 1974 quoted in full in footnote 4, *supra.*

19. The District of Columbia appellees question the subject matter jurisdiction of a federal district court to hear a case arising under the District of Columbia Code. The D.C.A.P.A., of course, is not a law of the United States for the purposes of establishing federal question jurisdiction. *See* 28 U.S.C. § 1363. The substantive claims against both the federal and nonfederal parties, however, revolve around the promulga-

tion of furlough regulations at the Lorton Reformatory. There exists, therefore, a common nucleus of operative facts such as to empower the district court to hear the entire controversy. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

20. See footnotes 2 and 17, *supra.*