# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 9, 2010        Decided April 30, 2010

No. 09-5153

ASSOCIATION OF CIVILIAN TECHNICIANS, INC., ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01747)

*Daniel M. Schember* argued the cause and filed the briefs for appellants.

*Kathryn A. Donnelly*, Special Assistant U.S. Attorney, argued the cause for appellees. With her on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney. *Lanny J. Acosta, Jr.*, Special Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

Concurring opinion by *Senior Circuit Judge* WILLIAMS.

ROGERS, *Circuit Judge*: Four former civilian technician members of the Puerto Rico Army National Guard ("PRANG") joined two labor organizations (collectively the "Guardsmen") in contending the district court erred in upholding the policy and practice of the United States, the Secretary of the Army, and the Chief of the National Guard Bureau (collectively "the United States") of recommending, rather than ordering, reinstatement of discharged members of a state National Guard.[1] The Guardsmen contend such authority is plainly conferred by 32 U.S.C. § 110, which authorizes the President to "govern" and "issue orders" to a state National Guard. The plain text does not address reinstatement. The United States' interpretation of its enforcement powers is consistent with the text read in light of the Militia Clause of the United States Constitution and the statutory scheme and represents a reasoned judgment of its relationship with the states' National Guard. Accordingly, we affirm the grant of summary judgment to the United States.

**I.**

The Guardsmen had dual status, by virtue of working as civilian technicians, which required them to be members of a state National Guard. 32 U.S.C. § 709(b)(2). Upon being notified of their proposed discharge from PRANG, pursuant to Puerto Rico Regulation 635-100 on involuntary separation, either the Guardsmen or their unit commanders filed rebuttals. However, U.S. Army Regulation 135-178 on administrative separations required PRANG to notify the Guardsmen in writing

---

[1] Because the differences between the status of Puerto Rico and a state are immaterial for purposes of this appeal, we will treat PRANG as a state National Guard. *See Penagaricano v. Llenza*, 747 F.2d 55, 56 n.1 (1st Cir. 1984).

of their right to request a hearing by an administrative board. None of the Guardsmen received this notice or appeared before an administrative board prior to their discharges. Instead, after filing rebuttals, they received honorable discharges from PRANG and were transferred to the Army Reserves or the Retired Reserves, depending on their length of service.

The Guardsmen appealed their discharges to the Army Board for Correction of Military Records ("the Board") requesting that their National Guard records be corrected to show they were never discharged and they were not absent without leave when PRANG was activated after Hurricane George. The Board found that the discharges violated federal regulations, which required both notice of a right to a hearing or appearance before an administrative board prior to discharge for persons with over six years of service, and the approval of the discharge by the Chief of the National Guard Bureau in the Department of Defense for any soldiers with over eighteen but less than twenty years of service.[2] Concluding the discharges were therefore erroneous and unjust, but that it lacked authority to order the Guardsmen's reinstatement in PRANG, the Board recommended that the Adjutant General of Puerto Rico amend the discharge orders, reinstate the Guardsmen with all pay, allowance, and retirement points, and correct PRANG records to show they were not discharged. The Board ordered the correction of U.S. Army Reserves records to reflect the Guardsmen's proper amount of service in PRANG, assuming no discharge. PRANG declined to reinstate the Guardsmen. The Guardsmen thus remained in the U.S. Army Reserves following their discharges from PRANG but automatically lost their

---

[2] *See* Enlisted Administrative Separations, Army Reg. 135-178 §§ 3-4(a)(7), 3-10 (2007); Enlisted Separations, Nat'l Guard Reg. 600-200 §§ 6-2, 6-32, 6-36 (2009).

civilian technician jobs because they were no longer members of PRANG.

The Guardsmen filed suit, seeking declaratory and injunctive relief that the United States' "ongoing policy and practice" of refusing to order reinstatement of Guardsmen and correction of state National Guard records and related relief was "based on an erroneous belief of lack of authority." Compl. ¶ 1. The district court ruled the Guardsmen's claim was cognizable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and that the United States' interpretation of its authority was reasonable and entitled to deference, granting summary judgment to the United States. *Ass'n of Civilian Technicians, Inc. v. United States*, 601 F. Supp. 2d 146 (D.D.C. 2009). The Guardsmen appeal, and our review of the grant of summary judgment is *de novo*. *See Fontana v. White*, 334 F.3d 80, 81 (D.C. Cir. 2003).

**II.**

The Guardsmen focus on 32 U.S.C. § 110, which provides: "The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard." They contend section 110 plainly authorizes the President to govern the PRANG, which necessarily includes the power to enforce federal regulations on discharge procedures. Because Congress placed this authority in the Secretary of the Army acting through the Board, *see* 3 U.S.C. §§ 301, 302; 10 U.S.C. § 1552, the Guardsmen maintain that section 110's authorization to "govern" and "to issue orders" means the Board can order reinstatement and correction of PRANG records where separation from PRANG violated federal regulations. The Guardsmen do not challenge the federal relief granted by the Board.

The United States responds that it has interpreted "govern" in section 110 to authorize regulations and orders that apply generally to all the states' National Guard while leaving control of the day-to-day operations to the states. It maintains that its interpretation is due deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984). The United States does not explain on what basis the court might conclude Congress intended the Board's interpretation of a statute to be accorded the force of law, *see United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001), and the record does not indicate that the Board's interpretation of section 110 was adopted in a rulemaking or formal adjudication; the Board's rules of procedure call for informal proceedings, *see* 32 C.F.R. § 581.3, and the provisions of the Administrative Procedure Act on adjudications do not apply to "the conduct of military . . . functions," 5 U.S.C. § 554(a)(4). However, it is undisputed that the United States' "policy and practice" is longstanding, and under the circumstances the court considers counsel's explanation of the statutory basis for the denial of the full relief sought by the Guardsmen to represent the United States' "fair and considered judgment." *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998). We conclude, regardless of the standard of review, that the denial of full relief to the Guardsmen was correct. *See Fontana*, 334 F.3d at 244.

We look to the text of the statute, recognizing that words are to be read in the context in which they are used and in the broader context of the statutory scheme. *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The plain text of section 110 does not address the nature and extent of the United States' governance of the states' National Guard. Although it authorizes the United States to "govern," neither the text nor the context require that the word be given its most expansive meaning. The Militia Clause and the statutory scheme

contemplate a shared responsibility for the National Guard, although the precise nature of that relationship is not always obvious. As the Fifth Circuit has observed, "in the modern-day federal scheme, the national guard has come to occupy a unique place. It has become, by design, a "hybrid" entity that carefully combines both federal and state characteristics, sometimes distinctly and sometimes not." *Lipscomb v. Fed. Labor Relations Auth.*, 333 F.3d 611, 614 (5th Cir. 2003). This court has made a similar observation, noting "[t]he National Guard . . . plays a dual role, operating under joint federal and state control." *In re Sealed Case*, 551 F.3d 1047, 1048 (D.C. Cir. 2009).

The Militia Clause of the Constitution provides that Congress shall have the power:

> To provide for organizing, arming, and disciplining, the Militia, and for governing *such Part* of them as may be employed in the Service of the United States, *reserving to the States* respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

U.S. CONST., art. I, § 8, cl. 16 (emphasis added). The Militia in this Clause is the National Guard, *see Gilligan v. Morgan*, 413 U.S. 1, 6 (1973); *In re Sealed Case*, 551 F.3d at 1048; *see also* 32 U.S.C. § 101(4), and the Clause expressly contemplates the reservation of powers to the States. The statutory scheme for the National Guard appears in Title 10, which addresses the armed forces generally and establishes the Board, and Title 32, which addresses the National Guard specifically. Title 10 provides

with respect to the Army National Guard of the United States[3] that, when not on active duty, its members "shall be administered, armed, equipped, and trained in their status as members of the Army National Guard." 10 U.S.C. § 10107; *see id*. § 12401. Title 32 provides, in turn, that when not called to federal duty by the President, 32 U.S.C. §§ 101(12), 102, 325, a state National Guard is under the command of the state Governor and the State Adjutant General, who is appointed by the Governor, 32 U.S.C. § 314. *See Charles v. Rice*, 28 F.3d 1312, 1315 (1st Cir. 1994); *Kise v. Dep't of Military & Veterans Affairs*, 832 A.2d 987 (Pa. 2003). This command falls within a federal framework established by Congress for the organization, discipline and governance of the states' National Guard in recognition that they are part of the force that may be needed for national security. *See, e.g.,* 32 U.S.C. §§ 102–05. Annual appropriations enacted by Congress provide funding to support the states' National Guard, including the issue of arms, other military supplies, and other expenses. *Id.* §§ 106–07. If a State fails timely to comply with or enforce a requirement or regulation, it risks loss of federal benefits, "as the President may prescribe," namely the loss of "money or other aid or benefit or privilege authorized by law." *Id*. § 108. Limitations are also placed on states' maintenance of other troops. *Id*. § 109. To ensure the readiness of the states' National Guard upon activation to federal status, *see* §§ 102, 104(b), 105, the

---

[3] As the court explained in *In re Sealed Case*, "[t]hrough the Department of Defense's National Guard Bureau, the Department of the Army extends federal recognition to state National Guard units that comply with federal criteria; it may withdraw recognition if a unit ceases to comply. 10 U.S.C. § 10503(8). These state National Guard units are known as the Army National Guard. 32 U.S.C. § 101(4). Together, all federally recognized state units comprise one of the reserve components of the Army, known as the Army National Guard of the United States. 10 U.S.C. § 10105." 551 F.3d at 1048.

President is to "prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard." *Id*. § 110. The President also may suspend certain provisions of Title 32 in time of war or congressionally declared emergency. *Id*. § 111. Congress established various personnel requirements to be eligible for federal recognition, such as the length of enlistment and related matters, *id*. §§ 302–04, but it did not address reinstatement of discharged Guardsmen to their state National Guard.

The United States has interpreted the statutory scheme to require the Commonwealth of Puerto Rico, when its National Guard is not on active federal duty, to be responsible for its administration, arming, equipping, and training. This interpretation is consistent with the statutory scheme setting out the Board's authority in section 1552 of Title 10. The United States explains the regulations and orders issued pursuant to section 110 are designed to establish uniform systems, processes, and standards among the states' National Guard. Thus, the National Guard Bureau issued Regulation 600-200 on separation of enlisted members from a state National Guard in an effort to standardize the due process afforded to members regardless of their state citizenship. *See* Appellees' Br. 18. So interpreted, section 110 does not authorize the United States to take over a state National Guard's daily administrative duties upon determining the state National Guard has failed to comply with discharge regulations. Rather, "[t]he daily operations of the national guard units are . . . recognized generally to be under the control of the states, but governed largely by substantive federal law." *Lipscomb*, 333 F.3d at 614. The United States acknowledges that "[t]o extend that power to the federal government would completely undermine the states' authority to administer their own affairs while in a Title 32 (non-federal) status." Appellees' Br. 17.

This interpretation of section 110 is consistent with the statutory text as used in the statutory scheme where governance finds a reasoned balance between federal and state control. It divides authority in a manner compatible with the National Guard's "dual role," *In re Sealed Case*, 551 F.3d at 1048, whereby the United States has chosen to defer to the state authorities on matters of daily operations, including individual membership. Moreover, it appears Congress has implicitly ratified the United States' "policy and practice" of refusing to issue orders of individual reinstatement to a state National Guard. *See Milhouse v. Levy*, 548 F.2d 357, 363 (D.C. Cir. 1976). As the Guardsmen acknowledge, for many years the Board has consistently issued recommendations rather than orders to the states' National Guard when it has found an error or injustice. *See, e.g.*, *Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1442 (9th Cir. 1988); *Jorden v. Nat'l Guard Bureau*, 799 F.2d 99, 102 n.5 (3rd Cir. 1986); *Williams v. Wilson*, 762 F.2d 357, 360 n.6 (4th Cir. 1985); *Navas v. Vales*, 752 F.2d 765, 770 (1st Cir. 1985). Section 110 in Title 32 has not been amended since its enactment in 1916. In 1994, when Congress amended the provision of Title 32 that authorizes withholding of federal benefits from a state National Guard in violation of a federal requirement, 32 U.S.C. § 108 (2009), it did not specify other remedies, although at the time appellate courts had upheld the United States' position that it lacked authority to order individual reinstatements in a state National Guard, *e.g. Christoffersen*, 855 F. 2d at 1442; *Jorden*, 799 F.2d at 102 n.5. *See Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575, 580–81 (1978). Although Congress' failure to act with regard to the United States' "policy and practice" might be due to inadvertence or inattention, this seems unlikely given its attention to regulatory enforcement in amending Titles 10 and 32 in 1994 upon establishing the National Guard Bureau. *See Milhouse*, 548 F.2d at 363.

The Guardsmen object that the United States' interpretation "eliminates the President's authority to 'prescribe regulations and issue orders, . . . to . . . *govern* the National Guard,'" Appellants' Br. 12, and would tie the President's hands when he needs to call upon the state National Guard if states were to discharge the members of their National Guard contrary to federal regulations, *see id.* at 11 n.8. But the United States' interpretation of "govern" simply reflects its judgment about the proper balance in the federal-state relationship contemplated by the Constitution and mandated by Congress. The Guardsmen's position erroneously assumes that to "issue orders" can only mean that orders must be issued in individual cases and not to govern the states' National Guard as a whole. They overlook Congress' organizational and command control, as well as the prohibition against general disbandment or reduction below a "minimum strength"of a state National Guard under 32 U.S.C. § 104. Furthermore, the United States retains the power of the purse arising from the reality that "[t]he Federal Government provides virtually all of the funding, the materiel, and the leadership for the State [National] Guard units." *Perpich v. Dep't of Defense*, 496 U.S. 334, 351 (1990); *cf. Laird v. Tatum,* 408 U.S. 1, 15 (1972); *New York v. United States*, 505 U.S. 144, 167 (1992).

Because the United States' interpretation is consistent with the Militia Clause and the statutory scheme and represents a reasoned judgment about its role regarding reinstatements of discharged members of the state National Guard, we conclude the denial of full relief to the Guardsmen was correct. Deciding where to draw the line involves subtle considerations the United States is well-positioned to evaluate and is, under the circumstances, deserving of our deference. *Cf. Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990). The Guardsmen, therefore, cannot prevail on their claim that the United States' refusal to order their reinstatement in PRANG is unlawfully

withheld agency action under the APA, 5 U.S.C. § 706(1) or arbitrary or capricious under the APA, 5 U.S.C. § 706(2). In challenging the United States' interpretation of section 110, the Guardsmen acknowledge that they have not more generally challenged the denials of the requested relief for lack of reasoned decisionmaking. Oral Argument Tape of Feb. 9, 2010 at 20.00–22.00.

Alternatively, the Guardsmen contend that PRANG records are records of the Department of the Army subject to Board correction pursuant to 10 U.S.C. § 1552. But section 1552 provides that "the Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Although a state National Guard may have federal status for certain statutory purposes, *see, e.g., In re Sealed Case*, 551 F.3d at 1053; *Lipscomb*, 333 F.3d at 613, whether it has federal status "necessarily turns on the particular [statutory] provision at issue in each case," *In re Sealed Case*, 551 F.3d at 1053. The Guardsmen point to nothing in section 1552 that would suggest Congress contemplated the Board's authority extends to the correction of state National Guard records. Nor do they reference any other statute that would bring state National Guard records within the Department of the Army for purposes of section 1552. In view of the plain text, the Guardsmen therefore fail to show the United States' refusal to order correction of PRANG records was arbitrary or capricious or contrary to law.

Accordingly, we affirm the grant of summary judgment to the United States.

WILLIAMS, *Senior Circuit Judge*, concurring:    I agree with the panel's opinion and write separately only to address an oddity in the principle invoked from *Association of Bituminous Contractors v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998).  See Maj. Op. at 5.  Under that decision, so long as an agency has a track record of resolving an issue consistently in the past, we treat counsel's explanation as representing the agency's "'fair and considered judgment'" even if the agency has never explained its reasoning prior to counsel's litigation arguments.    *Bituminous Contractors*, 156 F.3d at 1252 (quoting *Auer v. Robbins*, 519 U.S. 452 (1997)); cf. *Hill v. Gould*, 555 F.3d 1003, 1008 (D.C. Cir. 2009) (suggesting that *United States v. Mead Corp.*, 533 U.S. 218 (2001), may have superseded *Bituminous Contractors* to the extent that that case held that an agency position could be entitled to *deference* in the circumstance at issue); *Public Citizen v. Federal Motor Carrier Safety Administration*, 374 F.3d 1209, 1218 (D.C. Cir. 2004) (reciting the standard principle, in the context of a reasoned decision-making claim, that "[t]he expertise of the agency, not its lawyers, must be brought to bear on [the] issue in the first instance" (citing *SEC v. Chenery*, 318 U.S. 80 (1943))).

A curiosity of the *Bituminous Contractors* rule is that in any case in which it is applied and the statute (as ultimately construed by the court) allows but does not require the agency's construction, a litigant could successfully raise an argument under *Prill v. NLRB*, 755 F.2d 941, 947-48 (D.C. Cir. 1985)—namely, that a remand is in order because the agency may have wrongly thought itself compelled to adopt its interpretation.  See *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (applying *Prill* and discussing "the *Prill* line of decisions").  So far as appears, *Bituminous Contractors* left unaltered the pre-existing principle that a *Prill* claim cannot be defeated by litigation-stage assurances that the agency would have chosen its challenged interpretation as a

matter of discretion had it realized in the first place that it possessed discretion.

In this case, the challengers have affirmatively disavowed any argument that the agency decision failed for want of reasoned decisionmaking, see Maj. Op. at 10-11, which would encompass a contention under *Prill*, so that decision poses no obstacle to our rejecting their claim.